IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CARRIE L. GASKINS,

      Plaintiff,

v.
                        Civil Action No. 3:12cv81
                        (The Honorable Gina M. Groh)

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant," and sometimes "Commissioner") denying the

Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

The matter is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

For the sole reason that the ALJ failed to consider in his decision the plaintiff's having been

awarded Medicaid benefits by the State of West Virginia for 8 months, the undersigned must

recommend the case be remanded.

## I. PROCEDURAL HISTORY

Carrie L. Gaskins ("Plaintiff) filed an application for DIB on July 25, 2008 (protective filing

date) alleging disability since April 1,1999, due to fibromyalgia, heart problems, degenerative disc

disease, arthritis, and bursitis (R. 151). Plaintiff later amended her alleged onset date to June 1, 2007

(R. 12). Plaintiff's applications were denied at the initial and reconsideration levels (R. 71, 72).

Plaintiff requested a hearing, which Administrative Law Judge Karl Alexander ("ALJ") held on June

7, 2010 (R.37). Plaintiff, represented by an attorney, testified on her own behalf. Vocational Expert Larry Kontosh ("VE") also testified (R. 37). On July 14, 2010, the ALJ entered a decision finding Plaintiff was not disabled through the date of his decision (R. 12-26). Plaintiff filed a request for review to the Appeals Council, which was denied, making the ALJ's decision the final decision of the Commissioner (R. 1). This Complaint followed.

## II. FACTS

Plaintiff was born on January 27, 1966, and was 41 years old on her amended alleged onset date, and 44 years old on the date of the ALJ's unfavorable decision (R. 26, 151). Plaintiff obtained a GED and went to college for about a year studying nursing (R. 59). She has past work as a restaurant manager, owner/cleaner of her own house cleaning business, office clerk for her former husband's painting business, retail manager, insurance sales, photographer, and insurance sales agent (R. 63). Her most recent work was manager of a Dollar Express Store in Fairmont West Virginia, from August 2006, until June 2007 (R. 246). Prior to that she worked for two months as a photographer in 2003, quitting due to her medical condition. Plaintiff testified she left her last job at the Dollar Express because she "started getting really sick" (R. 43). The ALJ noted that the store she managed closed in 2007.

On Plaintiff's first Disability Report, she stated her illnesses, injuries, or conditions that limited her ability to work were fibromyalgia, heart problems, degenerative disc disease, arthritis, and bursitis (R. 151). She stated those conditions limited her ability to work because she could not sit or stand for very long, had a hard time remembering things, and could not lift or carry anything due to pain. Her conditions first interfered with her ability to work in 1999, which is when she stated she became unable to work because of these conditions (R. 151). She said she had to work fewer

hours and change jobs, and eventually stopped working entirely on July 1, 2007, because of her conditions.

Where asked to list her doctors, she noted Vipul Joshi, a rheumatologist for fibromyalgia, arthritis, and degenerative disc disease. She was treated with medications. She also listed William Werden, stating she saw him first in August 2007 for joint pain and was treated with medications. Both were in Florida. Starting in July 2008, she listed Family Medical Care in West Virginia as her "primary care doctor." Where asked: "What doctors do you see at this hospital clinic on a regular basis," she listed only "Josua [sic] Kolanko," who is a certified family nurse practitioner ("CFNP"). She listed her medications as Celebrex for arthritis, Lidoderm and Lyrica for pain, Nexium for stomach, promethazine for nausea, Tizanidine as a muscle relaxer and sleep aide, Tylenol and Ultram for pain, and Xopenex for asthma. She stated her medications caused no side effects (R. 155).

In her Personal Pain Questionnaire, Plaintiff stated her main pain was in her back/spine area (R. 180). It was continuous. It was very severe and caused her to not be able to work around the house, get a job, care for pets, cook and clean, go to social events, or do activities or her hobbies. Any kind of movement (sitting, standing, or walking) made it worse and nothing improved it. Plaintiff's second pain was in her hips, which was also constant, severe, and limited all her activities. Plaintiff's third pain was in her neck, and was also continuous, and so severe she could not wash her hair or look up or down for any period of time or move her neck from side to side too quickly. Nothing made the pain better.

Plaintiff also reported that most, if not all of her medications caused sleepiness, stomach aches, blurred vision, sweats, dizziness, and nausea (R. 183).

In narrative form, Plaintiff wrote:

I have whole body muscle pain, I have constant pain, any type of movement, activity, or sitting causes severe pain. The pain is so bad, I have headaches and nausea all day long. The joints in my fingers, wrists, elbows ache and hurt. My whole body hurts to the touch. It's painful putting on my clothes. I have knee pain that increases with walking. I have trouble writing. Shoulders – constant pain top of shoulder and behind blades. Burning, stabbing pain, hard to breathe pain is so severe, my entire body is in constant pain with no relief.

Plaintiff noted she had no help completing the form. Her list of medications included Lidoderm patch, Tylenol, Ultram, Celebrex, Nexium, Tizanidine, Lyrica, Promethazine, and Topamax. She said they were all prescribed to control pain except for the Nexium, but they did not control her pain.

Plaintiff listed her daily activities as waking up around 8 or 9 a.m. It took her 20-30 minutes to get out of bed. She would go to the bathroom, drink a cup of coffee (prepared by her husband), take a shower using a shower chair, then rest. She would then try to comb her hair (with her husband's help) then dress. She took her medications, rested, watched tv, and read until noon. She then made a sandwich for lunch, ate, took her noon medications, then napped until 2 pm. She then read or watched tv until her husband came home. He would bring or fix dinner. She then watched tv or read until about 8 pm, after which she took her evening medications and went to sleep (R. 185). She could not sleep through the night due to pain. Her husband helped her remember her medications and she had a pill case with "morning, noon, and night" on it.

She tried to fold laundry and put it away once a week. Her husband and grown daughter did the laundry, and her daughter cleaned the house, vacuumed and mopped and dusted. Plaintiff did no yard work because she could not sit or stand for more than ten minutes . She had severe pain in her hips. It was painful to fill out the form because of pain in her hands and fingers. She could and

4

did drive, and could go out alone. She shopped in the store, by mail, and on the computer. She only went to the grocery store about twice a month with her daughter or husband. She very rarely shopped for clothing –"usually for a funeral or special occasion." She was able to pay bills, count change, handle a savings and checkbook, but her lack of concentration made it harder than in the past. She stated she had "messed up" balances in the bank accounts.

She stated she had no concentration or memory, and did not complete tasks. She could walk only a few feet before needing to rest about 5-10 minutes. She was unable to handle stress, getting frustrated and crying and confused. She said that filling in the form had made her sick and nauseous. She used a cane, a walker, and a shower chair. None was prescribed by a doctor, however.

On September 20, 2007, Plaintiff presented to rheumatologist Vipul Joshi, MD, for a consultation on referral from her treating physician (R. 274). This is the first report in the record. Her chief complaint was joint pain and muscle pain. She complained of pain in her neck, shoulders, right elbow, hips, hands, and lumbar spine, with a severity of 8 out of 10. She said the symptoms began approximately one year earlier. It usually occurred during or after activity. Morning stiffness lasted one to two hours. Her symptoms had been worsening over the past few months, during which time she had relocated to Florida from West Virginia. She was recently started on Celebrex with some benefit. All labs, including ANA, RNP, Smith, DsDNA, RF, ESR, TSH, Uric Acid and CMP were negative or normal. X-rays of the knees, hips, and right elbow were also normal. X-rays showed some degenerative changes of C5-6 and dextroscoliosis. She had gone through physical therapy for her neck without benefit.

Upon examination, Plaintiff's mood was normal and her affect was without depression or anxiety. She had mild tenderness with no swelling and normal range of motion in all joints except

5

the right elbow which had decreased range of motion due to pain and moderate tenderness. She did have tender points in the left and right C5-7, left and right trapezius, left and right scapula, left and right rib, left and right elbow, left and right trochanter, left and right knee, and right gluteal (R. 276). She had trochanteric bursitis on the right and left. She had generalized tenderness in the cervical, lumbar, right SI, and left SI and diffuse muscle spasms in the cervical spine. Her cervical rotation was restricted, cervical flexion restricted, and lumbar flexion and extension restricted. Her gait was intact, and her station and posture were normal. She did not use mobility aids.

Dr. Joshi diagnosed unspecified myalgia and myositis, with a "working diagnosis" of fibromyalgia. He also diagnosed joint pain in multiple sites with no synovitis. He noted that Plaintiff reported severe hip, elbow and knee pain, but that x-rays were normal. She had some features of tendinitis/bursitis v. fibromyalgia, and so cortisone injections were offered. She rejected that offer. She saw Dr. Joshi again in October and November 2007, during which symptoms were mostly the same. She continued to decline any injections. She used no mobility aids.

On July 8, 2008, Plaintiff presented to Certified Family Nurse Practitioner ("CFNP") Joshua Kolanko to become established as a new patient (R. 414). She also needed medications refilled. She reported a "large history of fibromyalgia." She said she currently had pain everywhere. Her whole body hurt, but was currently worst in her spine and lower back. She got intermittent headaches and migraines. She also had pain in her hands. She said she attempted to function around the house but this was very difficult with the level of her pain. She was unsure if Celebrex was working or not. She recently started on Lyrica, and her family seemed to notice a difference with the medications. She also reported having a "possible history of hypertrophic cardiomyopathy. This was evaluated on Echo several years prior and [she] was told that her heart was thickening and needed to be

6

monitored closely." She reported feeling tired or poorly, but had no headache, no chest pain or palpitations, no dyspnea, no nausea, no vomiting, no abdominal pain, no diarrhea, and no constipation. She did report dysphagia and heartburn. She reported arthralgia with no swelling and stiffness localized to one of more joints of the hands. She reported no anxiety, no depression, and no sleep disturbances. Her weight was 181 pounds. She was fully oriented and alert. She did appear to be uncomfortable, changing positions frequently. Her mood was euthymic. Her abdomen revealed no abnormalities. She had pain on palpation of the neck, elbow, mid back, and lumbar spine. Straight leg raising was normal bilaterally. Sensation, motor exam, and reflexes were all normal. The assessment was headache, heartburn, inflammatory myopathy and dysphagia with food sticking in the lower chest.

On July 23, 2008, Plaintiff presented without appointment to CFNP Kolanko requesting something for pain (R. 412). She said the Ultram was not working and she wanted something else until her next appointment on September 8. She was given a lidocaine patch.

Plaintiff filed her application for benefits on July 25, 2008.

On August 8, 2008, Plaintiff presented to Dr. Fournier for the first time, for refills of Zanaflex, something for nausea, samples of Lyrica, lidoderm and celebrex. She also wanted to add back the Ultram (R. 409). She complained of shooting pains in her hands and lower arms and trouble walking. She said she had become confused and overwhelmed by the pain lately. She reported confusion and/or disorientation and sensory disturbance with anxiety and high irritability, but no depression, and a desire to keep living. Her weight was 187 pounds. She was fully alert and oriented. Her musculoskeletal system was tender over the spine, chest, and elbows. Her mood was depressed and anxious. Dr. Fournier refilled her Ultram and prescribed Cymbalta.

On August 18, 2008, Plaintiff presented to CFNP Kolanko with a chief complaint of getting dizzy, nauseated, clammy until she puked, and had wet herself when dizzy. She was also having a headache. She said she was at a wedding over the weekend and became sick and had a severe episode of vomiting and incontinence. She was having some intermittent nausea. She woke up today feeling sick and with a headache (R. 391). Her weight was 189. She was fully alert and oriented. She had some fluid in her left ear. Her mood was euthymic, her musculoskeletal system was normal. Motor exam was normal and her abdomen showed no abnormalities. There was mild mitral and pulmonic regurgitation. No significant valve disease was noted. There was mild hypocontractility perhaps, but that could be due to some extent due to her breast implants. "No critical abnormal findings were noted."

On August 25, 2008, Plaintiff presented to Nurse Practitioner Kolanko for a B12 vitamin injection (R. 390).

On August 31, 2008, Plaintiff underwent an echocardiogram for her history of palpitations (R. 441). There was no evidence of mitral valve prolapse.

On September 1, 2008, Plaintiff presented to CFNP Kolanko complaining of pain on her right side from her lower back into the knee (R. 376). She was having some pain with ambulation. It was worse yesterday. She was also getting some severe headaches. Her weight was 190 pounds. She was fully alert and oriented. She had pain with palpation of the lumbar spine with referred pain to right leg and buttock. Straight leg raising was positive at 45 degrees on right. Her mood was euthymic. Motor exam and sensory exam were normal. Abdominal exam was normal except mid epigastric tenderness with no rebound tenderness or guarding. She was diagnosed with epigastric pain and inflammatory myopathy (myositis).

On September 5, 2008, Plaintiff presented to Dr. Fournier for samples of Cymbalta, Zanaflex (muscle relaxant), Promethazine (for nausea) and lidocaine (for neuralgia) (R. 386). She was tolerating it "pretty well," and it was "helping with fibromyalgia pain." She was sometimes lightheaded and a little dizzy after meds, but it was tolerable. She reported "Overall feeling better." She still had nausea with vomiting. Her weight was 190 pounds. She was fully oriented and alert. Her mood was anxious. Motor exam demonstrated no dysfunction. The assessment was "feelings of weakness," inflammatory myopathy, and generalized anxiety disorder.

On September 11, 2008, Charity Care called the clinic and stated Plaintiff needed a prescription stating she could not work and why, otherwise she would have to apply at Job and Family Services (R. 383). CFNP Kolanko faxed the scrip to Charity Care.

The same date, Plaintiff called the clinic and requested her Ultram be increased. Dr. Fournier told the receptionist she remembered Plaintiff had told her it was working well at the current level. The receptionist said, "She meant that she was tolerating it, but is still in a lot of pain and would like it increased." The Ultram dosage was increased.

On September 27, 2008, Plaintiff was examined by Joseph Schreiber, D.O., at the request of the State agency (R. 288). She said that on a typical day, she was able to perform all of her activities of daily living, although her husband and daughter did most of the household chores. On examination, Plaintiff was fully alert and oriented. Her speech was clear and understandable. She was able to rise from seated, and climb on and off the examination table without difficulty or assistance. Her gait was symmetric. She was appropriately dressed in a pullover top, jeans, and laced tennis shoes. There were no trigger points in the extremities, or spine. She exhibited pain behaviors which disappeared with distraction. All ranges of motion were full. Her upper extremity

strength was 5/5, her hand grip was 5/5 and her fine manipulation was normal (R. 292).

On October 7, 2008, Plaintiff presented to Nurse Barb Fahey for complaints of severe abdominal pain (R. 373). She said she was vomiting, and could not eat or take medications. The pain had become excruciating over the past few days, so she went to the ER. As soon as she was discharged she developed pain and nausea and vomiting again. She was not able to stand up straight due to pain. She was fully alert and oriented, and all other systems were within normal measures. Abdominal auscultation revealed hypoactive bowel sounds. Her abdomen was tender to palpation. Her mood was euthymic. Her musculoskeletal system was normal. Her motor exam, reflexes, and sensation were all normal.

On October 10, 2008, State agency reviewing physician Rogelio Lim, MD completed a Residual Functional Capacity Assessment ("RFC") based on heart, DJD, fibromyalgia, bursitis, gerd, and asthma (R. 294) He found Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about 6 hours, and sit about 6 hours. She could only occasionally perform all posturals. She had no communicative or manipulative limitations. She should avoid concentrated exposure to temperature extremes, vibrations, and fumes, odors, dusts, gases, and poor ventilation. Dr. Lim noted the September 2008, exam, and found Plaintiff's allegations were not fully credible.

Plaintiff's application was denied at the Initial Level on October 10, 2008 (R. 71).

On October 14, 2008, Plaintiff's husband called her doctor, stating that Plaintiff was still very nauseated with dry heaves and headache. She was advised to go back to the gastroenterologist or the ER. Plaintiff was admitted to the hospital on October 14, 2008, for vomiting and abdominal pain (R. 305). She was found to have cholecystitis and underwent gallbladder surgery. She continued to report episodes of nausea and vomiting. Endoscopy revealed gastritis and a small hiatal

hernia.

On November 17, 2008, Plaintiff presented to Dr. Fournier for a 3-month follow-up and refill of Soma (R. 358). She said she had a lot more neck and low back pain. Her hand hurt "terribly if touches anything cold." Her weight was 191 pounds. She was fully oriented and alert. She had tight tender muscles over the cervical paraspinous and mid back. She was diagnosed with inflammatory myopathy (myositis), acroosteolysis, and cervicalgia. Dr. Fournier stated: "Keep fu with rheumatologist in May, sounds like developed Raynaud's do not let hands get cold."

On November 20, 2008, Plaintiff called Dr. Fournier's office, and said her rheumatologist took her off her pain medications, and gave her Ativan (an anxiety medication). Plaintiff told the office that the only reason the rheumatologist took her off Ultram was because of adverse interaction with Cymbalta. Plaintiff said she could not go without anything for pain, so Dr. Fournier said she could continue taking the Ultram (R. 356).

On December 3, 2008, Plaintiff saw gastroenterologist Carl Jones, D.O., who tested her and found her gastric emptying was significantly delayed (R. 327, 344)). She did not respond to Reglan. She continued to complain of heartburn, indigestion, nausea and vomiting. He discussed with her the possibility of trying Botox, but she had no insurance and was attempting to get State Medicaid. In the meantime, he gave her a prescription for Compazine to use as needed as well as the Reglan. Her weight was 184 pounds.

On December 4, 2008, Plaintiff saw Dr. Fournier for her chief complaint of knee and hip pain (R. 352). She said she had trouble walking and could not bear weight. The pain was excruciating in her knees even when in bed. She still had neck pain down her spine and had been diagnosed with gastroparesis. On examination, her weight was 184 pounds. She was fully alert and oriented. She

had a slow, antalgic gait with pain to palpation of the outer thighs, knees, and upper back. Psychiatrically her mood was listed as "one of pain." She was diagnosed with inflammatory myopathy (myositis) and bursitis.

On January 19, 2009, Plaintiff presented to CFNP Kolanko for a refill of ativan and an increase in topamax. On exam, she had no headache, no chest pain or palpitations, no dyspnea, no dysphagia, no heartburn, no nausea, no vomiting, no abdominal pain, no diarrhea and no constipation. She had no arthralgia, no swelling, and no localized joint stiffness. She had no dizziness, no fainting, no motor disturbance, and no sensory disturbance. She had no anxiety, depression, or sleep disturbance. Her weight was 186. She was fully alert and oriented. Every test was normal except for lumbar back pain on palpation. Her abdomen was normal. Motor exam was normal. Mood was euthymic. The assessment was headache, burning sensations, gastroparesis, inflammatory myopathy, lumbago, and idiopathic progressive polyneuropathy.

On January 26, 2009, Plaintiff presented to Nurse Fahey for a possible urinary tract infection with pain in her kidneys (R. 598). Her appetite was normal. She was not feeling tired or poorly. She had no recent weight change, no headache, no swelling. No dysphagia, no heartburn, no nausea, no vomiting, no diarrhea and no constipation. No arthralgias, no joint swelling, and no joint stiffness. No anxiety, no depression and no sleep disturbances. Her weight was 185. She was fully alert and oriented. Her abdomen was tender to palpation. Her musculoskeletal system was normal. Sensory, motor, and reflex exams were normal. Her mood was euthymic. The assessment was diffuse abdominal pain and microscopic hematuria (blood in the urine). She was scheduled for a urinalysis.

On February 2, 2009, Plaintiff was underwent a Mental Status Examination, performed by

Shana Nicholson, supervised by psychologist Anthony Golas, on behalf or the State agency (R. 451). Ms. Nicholson reported Plaintiff's gait as slow and her posture as generally slumped. Her hygiene was good. She gave her major complaints as fibromyalgia, degenerative disc disease, degenerative joint disease, arthritis, bursitis, Raynaud's disease, asthma, gastroparesis, neuropathy of the feet, depression, and anxiety. She complained of chronic pain, headaches, excessive worry, sadness, past failures, punishment and guilty feelings, being self-critical, thoughts of killing herself with no intent, crying spells, irritability, difficulty making decisions and concentrating, fatigue, memory loss, sleeping difficulties, racing thoughts and fears (of losing control, cracking up, fainting, physical illness, looking foolish, being alone, criticism, and that something terrible will happen), forgetfulness, distractability, loss of appetite, sleeping difficulties, and some cognitive decline. The onset was "on and off for twenty-four years."

Plaintiff had never participated in psychotherapy or been hospitalized for psychological reasons. She had been "on and off" psychotropic medications since 1998. Currently, the only "psychotropic" medication she was taking was topamax, a migraine medication.

On Mental Status Examination, Plaintiff's gait was slow and her posture was generally slumped. She was wearing jeans, tennis shoes, and a sweater. She was pleasant and cooperative. She was "perhaps histrionic at times, circumstantial at time, tearful at times, and she often spoke excessively." She made good eye contact, had some sense of humor and was able to carry on a conversation. Although her speech was often excessive it was easily understood with good articulation and syntax. She was fully oriented. Her mood was generally depressed and anxious and her affect was appropriate to her mood. Her thought process was at times circumstantial and histrionic in her presentation. She reported worrying excessively about her health. She reported no

illusions, hallucinations or depersonalization. Her insight was average. Judgment was normal. She reported fleeting thoughts of suicide with no plans or intention of harming herself. Her immediate memory was moderately deficient, recent memory markedly deficient, and remote memory moderately deficient "based on her difficulty recalling commonly known historical events and her own treatment history and other elements of her personal history." Her concentration was moderately deficient, based on difficulty performing serial sevens and threes. She appeared to be in pain.

Plaintiff's responses on the self-reporting Beck Depression Inventory yielded a score of fifty, placing her in the severely depressed range (R. 456). Her responses on the self-reporting Burns Anxiety Inventory yielded a score of 72, which placed her in the extreme anxiety or panic category. Her prognosis appeared fair.

Plaintiff reported going to sleep around 3 am and awakening around 6 am. She reportedly would 'crash' for a day or two after going with little sleep. She spent most of her days trying to relax and rest in a recliner. Her husband and daughter took care of most of the household chores. She showered more regularly now that she had a shower chair installed. She denied doing any chores around the house. Her social functioning was mildly deficient. Her concentration was moderately deficient, and she had significant problems staying on task and focusing, based on observations made during the examination and interview. Her pace was mildly deficient.

She was diagnosed with major depressive disorder, recurrent, severe, without psychotic features; generalized anxiety disorder; and personality disorder NOS with histrionic traits (R. 457).

On February 3, 2009, Plaintiff reported still having intense kidney pain (R. 597). She was taking cipro. She was advised to go to the ER. Plaintiff then called back asking for CFNP Kolenko.

She did not want to go the ER but wanted "some type of test????" (???? In Original). He called her and she said she wanted to have a CT scan. She wanted it done as an outpatient and not through the ER. CFNP Kolanko ordered the test.

On February 6, 2009, Plaintiff underwent a CT of her abdomen and pelvis for her history of abdominal pain (R. 592). The impression was a probable liver cyst, nonspecific bowel, findings in the pelvis suggesting remaining ovarian tissue, and prominent vaginal cuff.

On February 12, 2009, State agency reviewing psychologist Joseph Shaver completed a Psychiatric Review Technique (PRT") based on affective disorder (depression); anxiety-related disorder; and personality disorder (R. 459). There was no diagnosis of a somatoform disorder. Dr. Shaver opined she would have mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and had no episodes of decompensation.

Dr. Shaver also completed a Mental Residual Functional Capacity Assessment finding Plaintiff moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. She was otherwise not significantly limited in any functional area. Dr. Shaver found Plaintiff generally credible, but found the significant limitation in her daily activities seemed to be secondary to her physical conditions. He opined she retained the mental capacity to operate in routine, low stress, work-like situations that required only two to three-step operations and minimal production quotas

15

(R. 475).

On February 13, 2009, Plaintiff called CFNP Kolanko asking for "something for her neuropathy in feet and moving to legs" (R. 594). He called in a prescription for Neurontin.

Plaintiff's application was denied at the Reconsideration Level on February 17, 2009 (R. 72).

On February 20, 2009, Plaintiff followed up with nurse Fahey, stating she wanted to see a specialist to follow up on her hematuria (blood in urine) (R. 588). Upon examination, there was no visible blood, no burning or other problems. She was not feeling tired or poorly. She had no recent weight change, no headache, no palpitations, no dyspnea, normal appetite, and no soft tissue swelling; no polyphagia, no dysphagia, no heartburn, no nausea, no vomiting, no hematamesis, no abdominal pain, no diarrhea, and no constipation. There was no hematuria or dysuria. No arthralgia, joint swelling or joint stiffness. No dizziness, no fainting, no motor or sensory disturbances. No anxiety, depression or sleep disturbances. Her weight was 169. She was fully alert and oriented. Every test was normal including her abdomen. Musculoskeletal system was normal. Motor exam was normal and her mood was euthymic.

On February 22, 2009, Plaintiff underwent a transvaginal and transabdominal ultrasound, neither of which showed any definite organic pathology.

Plaintiff filed her Request for Hearing on February 23, 2009 (R. 84).

In Plaintiff's Disability Report for her Appeal she stated that her conditions had worsened, in that the pain had become more severe, and she had migraines, nausea and vomiting. It had become harder to walk and she had developed Raynaud's and gastroparesis. She had also become very depressed and anxious. She now needed help washing her hair, putting on her shoes, and getting into the tub. She was unable to hold cold drinks, was unable to eat due to constant nausea

and vomiting, had to lay in the recliner at least 5 hours a day to ease the pain, could not handle noise, light or company, and needed to be left alone. She was not able to sleep due to constant headaches. She had fallen down when standing or walking. She had forgotten she was cooking and burned food and almost caused a fire.

Plaintiff's husband completed a third party ADL form, stating that she would get dressed, take medicine, lay in the recliner, try to eat some lunch he made for her, take more medicine, try to sleep a while, watch tv, shower, take more medicine then try to rest. He helped her with her shoes and shirts, and sometimes washed and combed her hair and shaved her legs. She could no longer take care of the finances.

On March 4, 2009, Plaintiff presented to Carl Jones, D.O. for her gastrointestinal complaints (R. 631). She was scheduled for an endoscopy with Botox injection for her gastroparesis.

She had the procedure on March 13, 2009 (R. 625). The scope showed diffuse gastritis and a small hiatal hernia. Botox was injected around the pylorus.

On March 13, 2009, Plaintiff followed up with CFNP Kolanko (R. 579). She had had a scope done and botox injections to her abdomen. She said she continued to have no appetite, but her stomach was not hurting. She was not able to each as much. She reported problems with hypoglycemia "in the past." She wanted to be checked for diabetes. Her weight was 166 pounds. She was fully alert and oriented. Exam was entirely normal in all areas except for multiple areas of musculoskeletal pain . Motor exam reflexes and sensory were all normal. Her mood was euthymic.

On April 15, 2009, Plaintiff followed up with CFNP Kolanko (R. 571). She had seen Dr. Jones since her last visit and was placed on Amitia and Elavil "and this is helping." She felt she had a sinus infection.

Plaintiff told Kolanko her nerves were on edge, noting her son and his pregnant girlfriend just moved in with her. She reported Ultram was not working and she was getting no relief from her symptoms. Her weight was 173. She was fully alert and oriented. Her examination was totally normal except for tenderness of the sinus, and hyper sensitivity to pain in the neck and back with tenderness on palpation and muscle spasm. Her abdominal exam was normal. Her musculoskeletal system was normal, as were sensation, reflexes, and motor exam. Her mood was euthymic. CFNP Kolanko assessed nosebleed, acute sinusitis, vitamin D deficiency, inflammatory myopathy (myositis), lumbago, cervicalgia, and generalized anxiety disorder.

On April 22, 2009, the State of West Virginia approved Plaintiff for Medicaid medical coverage, effective starting October 2008 (R. 256).

A May 5, 2009 MRI of the thoracic spine showed mild right paracentral disc herniation at T7-8 and slight focal left paracentral T6-7 disc protrusion, without stenosis (R. 477). Cervical spine showed mild central C5-6 central disc herniation with right spurring causing some mild central stenosis.

A May 7, 2009 EMG and nerve conduction study were mostly normal, but "suggestive of radiculopathy involving the L5-S1 nerve root." (R. 480).

On June 23, 2009, Plaintiff presented to Healthways, Inc. for an Initial Psychological Evaluation (R. 633). Her presenting problem was that she felt very overwhelmed and in severe pain. She could not take various medications and was in a lot of pain. She was pushing everybody away and wished she was dead at times. She had a religious background, with her father as a pastor. She would not kill herself. She had applied for Social Security and been denied twice. She had been married five times. Most of her husbands were abusive. She had low self esteem and was always

worried about what others thought of her. She had a lot of guilt. She reported gastroparesis and pain in her neck, back, and hips, stating that her doctors could no longer help. She didn't eat because of the gastroparesis. She had gained a lot of weight then lost 30 pounds. She could now only eat one meal per day. She was not hungry. She said she would get confused and hardly remembered anything.

Plaintiff stated that she and her husband did not fight or argue, but she did not love him and wanted a divorce (R. 635). She had been married five times and was ready to divorce for the 5th time. Her husband had been a manager for 84 Lumber but the store closed and he was unemployed. They had been married five years. She said he was laid back and non confrontational. He was 31 and she was 43. She "can't stand to be with him." She was embarrassed by her past and all of her marriages. Most were abusive. She had two grown children.

Upon mental status examination, Plaintiff was dressed appropriately for her age, and the weather. She was open and cooperative, but said she was defensive because she had to explain herself. Her speech was normal, the flow was normal and was logical and clear. Her mood was depressed, anxious, and irritable. She said her grandchildren made her happy. She could drive but did not. She did not like being around people anymore (R. 636). She said she cried a lot and was easily frustrated.

The evaluator did not comment on Plaintiff's affect. She did find her thought process was logical and her thought content was suspicious. Her memory was good. She was fully oriented. Her insight was fair, and her estimated intellectual functioning was average.

The Impression Summary was as follows:

Carrie is a 43 year old 5x married female with a myriad of health problems. She is

> depressed and anxious.  She has longstanding personality disorder traits.  She feels
> guilty and is concerned about what others think of her.  She is embarrassed by her
> numerous marriages.  She has been with abusive men for the most part.  Her present
> husband is not abusive but she wants out of the marriage.  She feels like a failure.

(R. 638).

The provisional diagnosis was major depression, recurrent, severe, without psychotic features; and anxiety disorder, NOS; along with personality disorder NOS (R. 639).  Her psychosocial and environmental problems were assessed as discord with spouse, cannot work, and financial distress.  Her GAF was assessed as 49 currently, with 60 in the past year.  Plaintiff was to receive outpatient counseling and psychiatric services.

On June 26, 2009, Plaintiff presented to CFNP Kolanko for follow up and complaints of not feeling well, with nosebleeds, heart palpitations and chest pain, and left ear pain (R. 561).  She reported feeling tired or poorly, with chest pain.  She had no heartburn, nausea, vomiting, abdominal pain diarrhea or constipation.  She had no soft tissue swelling, no joint swelling and no joint stiffness.  She had some neurological symptoms of numbness and tingling.  She reported no anxiety, no depression, and no sleep disturbances.

Upon exam her weight was 177.  She was fully alert and oriented.  Exam was normal and mood was euthymic.  She was diagnosed with nosebleeds, chest pain or discomfort, palpitations, allergic rhinitis, inflammatory myopathy (myositis), and dysthymic disorder.

On July 10, 2009, Plaintiff presented to a psychologist for therapy using cognitive behavioral techniques to address mood, depression, anxiety, and feelings about her health and her marriage (R. 641).  Plaintiff said she was very down on herself, overwhelmed with financial concerns, and afraid "the two cars are going to be repossessed."  She was also afraid of foreclosure on her house.  Her

husband still had no job and his unemployment was ending. Her son came to town, and was going to help out. She felt defeated and worthless. She could not help her husband and could not do anything anymore. She did not want to drive or ride in the car. She could not fall asleep. She was very focused on her physical health problems. "She does not want people to think she's a hypochondriac." She did not want to come to counseling appointments because she felt like she was complaining. She was given agency referrals for possible help with payments for utilities and foods, but said she didn't want others to think she was looking for a handout. She was currently in the appeal process for social security disability and met state qualifications. She also noted her niece had Fabry disease and wondered if she had it. Plaintiff said she was depressed. She said she felt confused and sometimes thought impulsively. She was not suicidal or homicidal.

Plaintiff presented to CFNP Kolanko on July 22, 2009, for dysuria, urinary frequency and discomfort (R. 554). Upon exam her weight was 180. She was fully alert and oriented. Examination was totally normal except for suprapubic tenderness. Her mood was euthymic. She was diagnosed with increased urinary frequency, dysuria, and urinary tract infection.

Plaintiff saw her psychologist on July 24, 2009. The notes of this visit are barely legible except for the fact Plaintiff was upset because her husband's emergency unemployment was denied (R. 643). She said she rarely had a good day. She was anxious and depressed and didn't think anything would help her.

On August 17, 2009, Plaintiff called CFNP Kolanko's office stating she woke up in extreme pain and could not get out of bed and wanted to know if she could take an extra Soma. She was told absolutely not, and that if pain was that bad she would have to go to the ER. There is no record of her having done so.

On August 19, 2009, Plaintiff presented to psychologist Key for therapy (R 645). They addressed her guilt issues. Plaintiff said their car was repossessed. She was over-anxious. She said that "no one will prescribe her the Vistaril." She was taking Elavil, she said, for gastroparesis. She wanted to see Dr. Young, her rheumatologist, but could not get in to see her and was going to transfer to Dr. Pollock. She said her mind constantly raced and she never had a peaceful moment. She had her daughter and granddaughter at the house now. She spoke briefly of her grandson, noting that she got to name him. She brightened a bit when talking of her grandchildren. The psychologist found Plaintiff was upset about her financial stresses and inability to obtain the medical care she needed. She was encouraged to seek Charity Care, also to occupy her time with something enjoyable to try to help her racing thoughts.

On August 31, 2009, Plaintiff called CFNP Kolanko's office stating she was having severe chest pains every day, and "would like to see if medication would help her." She was scheduled for a treadmill test, and was told if she developed chest pain she needed to go to the ER. (R. 549). There is no record reflecting that she did so.

Plaintiff underwent a myocardial scan on September 3, 2009, for symptoms of severe chest pain for five days (R. 547). The impression was that, although the lung to heart ratio measurement was borderline abnormal, there was "no evidence of any myocardial ischemia or infarct." She was subsequently prescribed the heartburn medicine Nexium.

Plaintiff saw Ms. Key on September 16, 2009, for therapy (R. 647). She was upset about a situation with her son. She said she felt like a failure and did not know why her son hated her so much. Her son was having issues about a CD at the Federal Credit Union and got an attorney. She said he was a compulsive liar. He had the CD because he received a settlement as a child over being

attacked by a dog. She had used the CD as collateral at some point, and now that he was 21, he was accusing her of stealing his money. She said she went into the bathroom with some pills and said she would be better off dead, but was not suicidal or homicidal.

On September 24, 2009, Plaintiff presented to CFNP Kolanko for follow up, and to discuss "possible tremors" (R. 539). She reported she "started to get some shaking" sometimes in her hands and had episodes of studder [sic]. She said she had a "family history of essential tremors." She did have "some involuntary movements to the mouth and hands." She also reported she was "starting to have some increased GI symptoms" and "does get some difficulty with restless leg syndrome at times." It was reported that she saw Dr. Pollock, the rheumatologist, and that they were awaiting a letter from him.

Examination was all normal except for chronic myalgias. Her mood was dysthymic. The assessment was diffuse abdominal pain; a burning sensation; gastroparesis; vitamin D deficiency; inflammatory myopathy (myositis); acroosteolysis; extrapyramidal disorder; polyneuropathy; idiopathic progressive polyneuropathy; organic periodic limb movement sleep disorder; and hypochromic/microcytic anemia.

On September 28, 2009, Plaintiff presented to rheumatologist Burton Pollock, M.D. (R. 487). He first noted "her rather complete evaluation" by rheumatologist Elizabeth Young, noting Dr. Young's diagnosis was somatization disorder. He also noted Plaintiff had "symptoms relevant to every organ system in her body." He noted that Dr. Young did feel that Plaintiff had fibromyalgia, but that her symptoms were perhaps more deep seeded [sic] with psychiatric problems. She had the pain for many years and had seen many physicians. She had also seen a rheumatologist while she lived in Florida, who did extensive x-rays which were all normal except for some mild DJD. Her

husband's job was terminated and they came back to West Virginia, where he was still looking for work. She reported total body pain, fatigue, and symptoms relative to every organ system. She had been following with Dr. Singh, Dr. Jones, Dr. Bejjani, and Dr. Fournier. She had been on numerous medications. She reported numerous drug allergies. She had no joint swelling. She reported she could not do anything at times and her children had to help her get dressed. Her pain woke her up two or three times a night and so she was never rested.

Plaintiff said she had a poor appetite, didn't sleep well; had occasional popping in her right ear; sinus bleeding at times; asthma, usually exercise induced; history of mitral valve prolapse recently found to have an arrhythmia; history of alternating periods of constipation and diarrhea; a lot of heartburn; recent diagnosis of Raynaud's; and hypoglycemia. Records showed an EMG study did not find peripheral neuropathy but did evidence a pinched nerve in the back. MRI did not find any evidence that required surgery but did show osteoarthritis of the back. She was being followed at a psychiatric clinic, but the psychiatrist "just wants her to try to get better control of her life." She saw a therapist occasionally and he was trying to get her medications regulated. She was going to Dr. Jones for irritable bowel syndrome and "the fact that her throat closes at times." Her weight was 196.

On physical examination, she appeared anxious. Her lungs were clear. Her heart sounds were normal. There was no guarding or tenderness of the abdomen. She had negative Tinel's sign. Straight leg raising to test for spinal problems produced only pulling in the hamstrings. Dr. Pollock stated: "She has 18 out of 18 tender points but every inch of her body is tender." Her entire spine was tender, but she had full range of motion, with straight leg raising only producing pulling in the hamstrings at 30 degrees. Her shoulders, elbows, wrists, hands, knees, and feet and ankles were all

normal with full range of motion. Her grip strength was good. She was having a fine tremor over the hands at the time. Her hips had normal range of motion but extreme tenderness over the trochanteric bursa.

Dr. Pollock, a rheumatologist, diagnosed somatic form disorder, generalized fibromyalgia, depression, anxiety, irritable bowel syndrome, feeling of choking, migraines, Raynaud's "possibly," "history of" tremor in the hands, and "history of" hypoglycemia. He explained to Plaintiff that he believed the symptoms were fibromyaliga-related. He told her that only one doctor should be doing all her medications and that the medications shoud be decreased rather than increased. He told her to get off the Soma and Ambien, and increase the Elavil. She was on Neurontin which she believed helped the tingling in her hands. He wanted her to talk to her psychiatrist about starting the Cymbalta again. Dr. Pollock, rheumatologist, concluded:

> The woman is totally disabled by somatic form type disorder. She has symptoms relatively everywhere in the body. I tried to explain to her that there would be no quick fix and to try to avoid any surgery or more testing. We will get her back in a couple of months for a discussion visit.

(R. 490). There is no record of a follow-up appointment.

On November 9, 2009, Plaintiff saw Ms. Key for therapy (R. 650). She had missed her last appointment due to flu-like symptoms and issues with "all of her family." She also said Dr. Malalay had prescribed Remeron. She now had tardive dyskinesia, tremors, tongue swelling, and drooling and difficulty swallowing. She was now able to sleep until 5 because of the Requip. Her daughter had moved back out. Her son threatened to kill her over the phone because someone called Child Protective Services on him and he thought it was her, but she said she didn't. She had the locks on her house changed. She was not suicidal or homicidal.

On November 25, 2009, Plaintiff called CFNP Kolanko's office "very upset wanting to know why her script for Ultram ER 300 was changed from BID to 1 po qd." She said she had been taking it BID and that helped and worked for her. She wanted to know why and why she was not advised of this change." CFNP Kolanko responded that the maximum daily dose was changed by the FDA to 300 mg. daily, and he could not change that.[1]

Plaintiff saw CFNP Kolanko for follow up and complaints of dysuria on November 30, 2009 (R. 521). She had been taken off Vistaril and put on remeron. She reported a great deal of pain in her hands and elbows. She reported pain and decrease in strength in her knees and when ambulating, more than usual. She had difficulty moving her hands at times. She experienced weight gain, because she was not as active. Her weight was 210 pounds. She appeared in acute distress, uncomfortable and repositioning herself frequently. She was fully alert and oriented. Examination was normal except for discomfort on palpation of the upper neck, throughout the back, and hands and elbows. There was no deformity or crepitus, but she did have some decrease in grip strength. She also had pain in both hips. Her mood was dysthymic, depressed with no thoughts of suicide or hurting herself. She was assessed with vitamin D deficiency, extrapyramidal disorders, polyneuropathy, organic periodic limb movement sleep disorder, and generalized anxiety disorder.

Plaintiff saw her psychologist on December 2, 2009, for therapy (R. 652). She said she was feeling bad physically. She was limping. She was very focused on somatic issues. She said she had

_____

[1]Ultram ER should not be administered at a dose exceeding 300 mg. per day. Clinical studies of Ultram ER have not demonstrated a clinical benefit at a total daily dose exceeding 300 mg.Further there is a major drug interaction with Cymbalta, and moderate interactions with Ambien, Celebrex, lyrica, neurontin, xanax, and tizanidine. Interactions with Cymbalta include confusion, seizure, increased heart rate, muscle spasm of stiffness, tremor, stomach cramps, nausea, vomiting and diarrhea. http://www.drugs.com. (Accessed 3/8/2013).

tardive dyskinesia from her Reglan, and was taken off it. Now she was reporting a twitch in her left eye. She had gained a lot of weight due to medication. She had gastroparesis and said her food was turned into fat. She was "real depressed." She was doing fine with her husband, but was now sad and lonely now that her daughter and granddaughter moved out. She said the Remeron was helping her sleep. She was concerned that her brother was sent to prison for his 2nd DUI. She had gone to her mother's church over Thanksgiving and there were several relatives there. She socialized with some of them. She was very self-conscious and thinks others are judging her. The psychologist discussed that she was not the center of attention even though she felt like all eyes were on her. The psychologist said Plaintiff was "still depressed." She was encouraged to work on rational thinking and work on her anxiety about going out in public.

Plaintiff canceled her January 13, 2010, appointment with her psychologist, saying she had been sick and forgetful and had forgotten about it. She said she had stomach problems and Dr. Jones wanted to do "Botox surgery" again. She was waiting to apply for Charity Care.

On January 14, 2010, Plaintiff presented to CFNP Kolanko for follow up (R. 514). She reported improved urinary symptoms. She reported she had no rheumatologist at the present time. She had not applied for Charity Care. She reported her hips, knees, and upper legs still hurt. Her weight was 215 pounds. She appeared in acute distress, uncomfortable and repositioning frequently. She was fully alert and oriented. Examination was normal except for discomfort on palpation to the neck and back, and pain in the hands and elbows. There was no deformity or crepitus, but some decrease in grip strength. She had pain in her hips. Her mood was dysthymic. The assessment was recent weight gain, dysuria, feelings of weakness, knee joint pain, obesity, and lumbago.

Plaintiff saw her psychologist on February 17, 2010 for therapy (R. 655). She stated she had

seen Nurse Kolanko, who ordered x-rays. She had a lot of pain in her back but had no insurance for the pain clinic. She was upset because now that her husband was back at work she had to pay a 65% co-pay. She continued to have problems with sleep.

On March 12, 2010, Plaintiff called the clinic with complaints of cough for over a week, and swelling in her ankles and feet that hurt to touch so she could not put on shoes. She was advised to lower her sodium intake and elevate lower legs, and was prescribed loratidine for her cough. Plaintiff called back and said she had already been on loratadine for over a year, and asked if there was something else for her cough. The doctor prescribed Tessalon. (R. 495).

The next day Plaintiff presented to nurse Barb Fahey with complaints of her feet, ankles and hands swelling (R. 492). Otherwise she was not feeling tired or poorly, had no chest pain and no dyspnea, but had a cough and soft tissue swelling. Upon exam she weighed 228 pounds. She did have edema of the hands, which were slightly swollen and 1+ (slight) edema of the feet and ankles. She was otherwise normal. The assessment was soft tissue swelling.

March 19, 2010, knee and hip x-rays were all unremarkable (R. 501- 503).

On March 24, 2010, Plaintiff presented to CFNP Kolanko for follow-up and review of knee and hip x-rays (R. 504). X-rays of the knees and hips were normal. She reported pain in her lower back and buttocks, with problems standing at times. Her knees were sore and she had difficulty getting out of a chair, and when walking needed to have someone help her ambulate. She was considering getting a cane or a walker. Upon exam she weighed 218 pounds. She was fully alert and oriented. She was in no acute distress but very uncomfortable and tearful at times. She had pain on palpation of the lumbar spine, left hip and both knees. X-rays were negative. Exam was difficult "due to hyper response to pain on palpation of all areas." Her mood was dysthymic and depressed

28

and tearful. She had no thoughts of suicide but was very frustrated. She had exacerbations of anxiety. The rest of the exam was normal. The assessment was hip joint pain, knee joint pain, gastroparesis, female stress incontinence, and inflammatory myopathy (myositis). CFNP Kolanko was very concerned about her polypharmacy and was at his prescriptive limits. He therefore made her an appointment with Dr. Fournier for evaluation. He was not comfortable adding any medications. He encouraged her to keep her appointment with Dr. Pollock, the rheumatologist, and recommended exercises for stress incontinence.

On March 30, 2010, Plaintiff presented to Dr. Fournier on the recommendation of CFNP Kolanko for pain management. Her chief complaint was that she was starting to have tremors, was in a lot of pain, and was having a lot of trouble with her knees (R. 497). Upon examination her weight was 219. She was fully alert and oriented and in no acute distress. She appeared to have pain everywhere, with difficulty walking and standing. Her mood was "one of pain." The assessment was pain syndromes and fibromyalgia.

Plaintiff saw her psychologist on April 8, 2010, for therapy (R. 656). She said she had been prescribed Duragesic for pain and so far, was doing ok with it. She was upset because she was having trouble with her son again. He was threatening to sue her over the CD money. She said he actually owed her $1200.00. He threatened not to let her see her grandson again, and she was upset about this. Things were not going well for her daughter and granddaughter and son-in-law and they were all going to move in with her for a few months. When asked, she said she thought she could handle the extra people in the house and potential stresses. The psychologist stated that Plaintiff was still depressed. She was not homicidal or suicidal, however. She was not very active due to her physical ailments. She encouraged her again to engage in some type of enjoyable activity.

Plaintiff was mailed her Notice of Hearing on April 20, 2010, scheduling her hearing for June 7, 2010 (R. 92).

Plaintiff saw Ms. Key on April 26, 2010 for therapy (R. 657). The psychologist said Plaintiff was behaving oddly during the session. She said she was having a panic attack because there were people who sat near her in the waiting room. She said she did not want to be bothered at all. She cried because of the anxiety. She was "going to court in June" and was worried about being in front of people. She "was upset" because, when she had last seen Dr. Pollock about six months earlier "he outright told her that she was fat." She felt that he was rude and abrasive and she tried to explain her stomach problem to him which she said caused the weight gain. She said he also recommended that she start a medication called Savella[2] for fibromyalgia, but she was anxious about that. She was on Duragesic and Inderal because of a tremor. She said she had been stuttering. She was on another medication to help her deal with retaining water. She spoke of another rheumatologist named Alayli, and said she would prefer to see him.

Plaintiff complained that her husband worked all the time then came home and ate and went to bed. She got up and drank coffee with him in the morning and that was the most they saw of each other. She was recently upset because her daughter had a respiratory issue and was rushed to the hospital. The psychologist stated Plaintiff remained preoccupied with her numerous health issues, medications, and side effects. She was not homicidal or suicidal. She panicked when around other people. She was encouraged to work on relaxation.

On May 20, 2010, Dr. Fournier completed a "Fibromyalgia Residual Functional Capacity

---

[2]Like Cymbalta, a medication specifically FDA-approved for fibromyalgia. www.Mayoclinic.com/health/milnacipran/ANO2019 (August 23, 2011) (accessed April 30, 2013).

Questionnaire" for Plaintiff (R. 661). She said she had been seeing Plaintiff since July 2008 (two years). She met the criteria for fibromyalgia. Dr. Fournier did not list any other impairment(s). She said it lasted or was expected to last at least 12 months. She left blank the portion of the questionnaire that asked for the "clinical findings, laboratory and test results that show your patient's medical impairments." She checked off the following symptoms: Multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, Irritable Bowel Syndrome, frequent severe headaches, vestibular dysfunction, numbness and tingling, Raynaud's phenomenon, breathlessness, anxiety, and panic attacks. (She did not check off mitral valve prolapse or panic attacks). She said Plaintiff was not a malingerer. Emotional factors did contribute to the severity of her symptoms and functional limitations. She identified pain everywhere bilaterally. The pain was daily on a scale of 8/10 on average. It was worsened with stress, changing weather, fatigue, movement, and static position. Her impairments were reasonably consistent with the symptoms described. Pain would be constantly severe enough to interfere with attention and concentration needed to complete even simple work tasks. She was incapable of even low stress jobs. She had side effects including drowsiness, dizziness, swelling, and nausea. She could walk less than one city block. She could sit 10 minutes at a time and stand 5 minutes at a time. She could sit and stand/walk less than two hours in an 8-hour workday. She needed to include periods of walking around every 5 minutes for 2 minutes at a time. She must use a cane or other assistive device often. She would need to take unscheduled breaks. Dr. Fournier handwrote "unable to work." If she had prolonged sitting her legs must be elevated above the level of her heart 90% of the day. She could occasionally lift less than 10 pounds. She had significant limitations reaching, handling or fingering. She could never grasp, turn, twist, or do fine manipulation. She could reach

5% a day.  She would average more than 4 absences per month.

At the Administrative Hearing held on June 7, 2010, Plaintiff testified that she last worked as the manager of a Dollar Express store for less than a year in 2006- 2007 (R. 42).  She testified she left that job because she "started getting really sick."  She "was starting to have problems with [her] heart," and was "hurting really bad."  She wasn't able to do her job and was missing work.  She was starting to get severe headaches and developed asthma.  Her whole body started hurting.  The ALJ interrupted to ask hadn't the store  actually closed down at the time, to which Plaintiff replied it had.  The following discussion took place:

A:     I actually was - - I gave my notice to leave the store and they decided to close the store down and that's why they - - I gave my notice and they decided to close the store down so –

Q:     Why?  Because - -

A:     Because they had no one else to run the store.  They actually had put me in there because the manager that ran the store before me had, kind of, run it into the ground.

Q:     Mm-hmm.

A:     They brought me in to, kind of, be a new light, a new manager.

Q:     Ok.

A:     Because I would - - I could do advertising for them, and they thought that I would be a fresh face for the store.  And then when I became sick, they just figured there was no reason to keep the store open.  It was in, like, a poor location, and they just decided to close the store down.

(R. 43-44)

Plaintiff lived in a two-story home.  She had to go up about three steps to get into the house.

32

She testified she was "having a little trouble getting up the steps," and that her husband and she were talking about redoing the porch to make it a little easier for her to get up the steps.

Plaintiff described a typical day as waking up and taking a long time to get out of bed. She was usually really stiff and hurting. Her hips hurt from her bursitis and she was having a lot of problems with her knees. She had to physically move her legs to try to get them to walk. If she was "unable to work it out," she "had to get the walker." Plaintiff had a walker and a cane with her at the hearing. She said she used the cane quite often and the walker about once a month, depending on how bad her knees were. She testified she'd actually stayed in bed a week at a time because she had "no strength" in her knees and was unable to walk. She testified Dr. Fournier thought it was a good idea for her to use the walker and the cane. She had a hard time getting on and off the toilet because of her knees. She could no longer bathe, but had to take showers, using a shower chair. She usually just wore sweat pants and a shirt so she didn't have to button, and flip flops because she could not bend to put on shoes. She would eat a Pop-Tart or granola bar for breakfast. Then she would "work [her] way over to [her] recliner, and put [her] legs up and rest . . . because at that point, [she was] exhausted and in a lot of pain."

She would forget to take her medications, so her husband put them all in a pill carrier with the days of the week, and morning, noon, and night on them, with a timer. She said she sometimes took all her nighttime medicines in the morning by mistake.

Once in the recliner, she usually stayed there quite a while trying to rest. She would turn on the tv, but her medications were so strong they made her really groggy and tired. She didn't eat lunch because of her stomach condition. If she ate breakfast she was sometimes not even hungry for dinner. After lunchtime she had to get up from the recliner because her hip got real stiff, and she

might walk to the kitchen to get a drink of water. She would then go back to the recliner or sometimes just go to bed and take a nap. She would be "really exhausted and really in a lot of pain." Her pain was "everywhere." She had severe headaches, her neck hurt, her shoulders hurt, she had bursitis in her hips, her knees hurt, and her hands hurt.

Plaintiff testified she did not cook at all. Her husband would bring dinner home, and her daughter would come over several times a month. Her daughter also did the housework. She could no longer concentrate to read. She could sit for about ten minutes before needing to stand, and could only stand for about five minutes. She mostly needed to lie down. She believed she could sit and stand a total of 40 minutes in an eight-hour day. She began having hand tremors about a month before the hearing. Her doctor diagnosed her with central tremors, which also included stuttering.

Plaintiff testified she also had gastroparesis, a stomach disorder, where her food would not digest. On occasion, she was nauseous all the time because she had had surgery to keep her stomach flap open all the time. She might vomit only every other day now, instead of every day, but was nauseous all the time. She was taking Moviprep[3] every three days, and then have severe diarrhea for two days.[4] She could not walk from her living room into the kitchen without becoming out of breath. Some of her side effects from medications include dizziness, nausea, edema of the feet and hands, and dry mouth. There were days she "crashed" in bed "literally three days at a time" without eating or getting up. This occurred at least once a month.

_____

[3]MoviPrep is a two-liter PEG bowel cleansing agent FDA-approved for cleaning of the colon as a preparation for colonsocopy. www. drugs.com/history.moviprep/html (accessed April 30, 2013.)

[4]The undersigned could find nothing in the record indicating a prescription for or discussion of MoviPrep for continuous use as described by Plaintiff.

The ALJ asked the VE if there would be any jobs available for a person of Plaintiff's age, education and experience, who could only perform sedentary work. The person would need a sit/stand option, could perform postural movements only occasionally except no balancing or climbing ladders, ropes or scaffolds. She must do all walking on level and even surfaces, should not be exposed to temperature extremes or wet or humid conditions, environmental pollutants, or hazards, should work in a low stress environment with no production line or assembly line pace and no independent decision making responsibilities, would be limited to unskilled work involving only routine and repetitive instructions and tasks, should have no interaction with the public and no more than occasional interaction with coworkers and supervisors. The VE testified there would be occupations the hypothetical person could do that existed in significant numbers in the national and regional economy. Those jobs would accommodate the use of a cane to get into and out of the job site and to and from the job position.

Counsel asked if any jobs would be available if the person would be absent more than four days a month, to which the VE replied there would not. If the person could only sit, stand, and walk less than two hours total, there would be no jobs. If the person needed her legs elevated above the level of her heart 90 percent of the day, no jobs would be available. There would be jobs available, however, if the person only needed to elevate her legs straight out from a chair.

### III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Alexander made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.     The claimant has not engaged in substantial gainful activity since June 1, 2007 the alleged onset date (20 CFR 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: fibromyalgia; mild degenerative disc disease/degenerative arthritis of the cervical and thoracic spine; degenerative disc disease/degenerative arthritis of the lumbar spine with EMG and nerve conduction studies suggestive of radiculopathy; asthma; major depressive disorder, recurrent, severe; generalized anxiety disorder; somatoform disorder; personality disorder with histrionic traits (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with an option to sit or stand; can perform all posturals occasionally, except no balancing or climbing ladders, ropes or scaffolds; to the maximum extent possible all walking should be done on level and even surfaces; no exposure to temperature extremes, wet or humid conditions, environmental pollutants or hazards, such as dangerous moving machinery or unprotected heights; work should be in a low stress environment with no production line or assembly line type of pace and no independent decision-making responsibilities; work should be unskilled with only routine and repetitive instructions and tasks; no interaction with the general public and no more than occasional interaction with coworkers and supervisors.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on January 27, 1966, and was 33 years old,[5] which is defined as a younger individual on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

---

[5] This age is based on the original alleged onset date, which, as already noted, was amended by counsel to 2007. Significantly, even with the amended date, Plaintiff is still defined as a younger individual.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant was not under a disability, as defined in the Social Security Act, at any time from April 1, 2005, the alleged onset date, through December 31, 2008, the date last insured (20 CFR 404.1520(g)).

(R. 12-33)

# IV. DISCUSSION

## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were

37

the case before a jury, then there is 'substantial evidence.'" <u>Hays</u>, 907 F.2d at 1456 (<u>quoting</u> <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.   The ALJ failed to proper [sic] analyze and weigh the opinion of Claimant's primary treating physician, Kelly Fournier, M.D.

2.   The ALJ failed to properly analyze Plaintiff's subjective complaints of pain and Plaintiff's credibility regarding her exertional limitations.

3.   The ALJ erred in not posing proper hypothetical questions which include all of the Plaintiff's limitations.

4.   The ALJ erred in failing to consider other findings of disability.

The Commissioner contends:

1.   The ALJ appropriately assessed the medical evidence of Plaintiff's physical impairment, including Dr. Fournier's assessment.

2.   The ALJ appropriately assessed plaintiff's credibility.

3.   The ALJ's hypothetical question included all credibly established limitations of record.

4.   The ALJ appropriately addressed the entire record.

## C. Dr. Fournier's Opinion

Plaintiff first argues that the ALJ failed to proper[ly] analyze and weigh the opinion of her primary treating physician Kelly Fournier, M.D. Defendant contends the ALJ appropriately assessed

the medical evidence of Plaintiff's physical impairment, including Dr. Fournier's assessment.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983). In Craig v. Chater, 76 F.3d 585, 590(4th Cir. 1996), however, the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

In DeLoatche v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983), the court stated:

> Neither the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary. . . .

Section 404.1527(e)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 404.1527(e)(1).

Plaintiff asserts the ALJ "failed to comply with []controlling law in not providing any

legitimate reasons for his obvious rejection of the opinions of Dr. Fournier regarding Plaintiff's functional limitations." The undersigned disagrees. The ALJ discussed the "Fibromyalgia Questionnaire" filled in by Dr. Fournier in May 2010. This was Dr. Fournier's only opinion. The ALJ stated he was unable to give significant consideration to the "Fibromyalgia Questionnaire," noting:

> Dr. Fournier's own records contain few objective findings relating to anything that she opines on [sic] and are of very little use overall, particularly regarding the requirement to elevate her legs above her heart 90 percent of the time or the claimant's inability to work even at low stress work. Regarding the claimant's restriction from even low stress work, Dr. Fourier clearly has overstepped her area of expertise. In the opinion of the Administrative Law Judge this doctor is quite obviously advocating for her patient's benefits and I don't accord her much credibility.

While Defendant does not dispute that Dr. Fournier is a "treating physician," the stated reason a treating physician's opinion should be accorded great weight is because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983). Dr. Fournier actually saw Plaintiff only six times over the entire two-year span. Prior to filling out the form questionnaire in May 2010, her last two encounters with Plaintiff were in December 2008, then next in March, 2010, upon recommendation of CFNP Kolanko. The form does not indicate any further examination by the doctor. The undersigned does not find this was a "continuing observation" of Plaintiff's conditions "over a prolonged period of time." Instead, Plaintiff was nearly always examined and treated by CFNP Kolanko. Plaintiff may argue that CFNP Kolanko works in the same clinic as Dr. Fournier, and is likely supervised by Dr. Fournier. Other facts would weaken this argument, however. CFNP Kolanko was clearly Plaintiff's primary care provider. He actually finally referred Plaintiff to Dr.

Fournier when he was concerned about her "polypharmacy" and that he may have reached his "prescribing limits" for her. Even more significantly, Plaintiff herself listed Family Medical Care in West Virginia as her "primary care doctor, " and where asked: "What doctors do you see at this hospital clinic on a regular basis?" she listed only Kolanko.

Most importantly, even if CFNP Kolanko was found to be an agent of Dr. Fournier, Kolanko's office visit records do not support Dr. Fournier's opinion.

On May 20, 2010, Dr. Fournier completed the "Fibromyalgia Residual Functional Capacity Questionnaire" for Plaintiff (R. 661). Dr. Fournier stated that Plaintiff met the criteria for fibromyalgia, but did not list any other diagnosed impairment, although the form requested other diagnosed impairments. She also left blank the portion of the questionnaire that asked for the "clinical findings, laboratory and test results that show your patient's medical impairments."

Regarding Dr. Fournier's opinion that Plaintiff "Can not work," Section 404.1527(e)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."

As already noted, Dr. Fournier's only opinion was in a "check off" form, which has been referred to by other courts as "weak evidence at best." Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993)("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.") Mason has been cited with approval by a number of district courts within the Fourth Circuit. See, e.g., Wright v. Astrue, 2013 WL 275993, (W.D.Va. 2013), Leonard v. Astrue, 2012 WL 440508 (W.D.Va. 2012), McGlothlen v. Astrue 2012 WL 3647411 (E.D.N.C. 2012), Bishop v. Astrue, 2012 WL 951775 (D.S.C. 2012), Naselrod v. Astrue 2010 F.Supp 2d (D. Md. 2010). In this case, even though there were spaces provided for Dr. Fournier to identify the

clinical findings, laboratory and test results that showed Plaintiff's medical impairments, she left those spaces blank. Where asked to list any other diagnosed impairment besides fibromyalgia, she left that space blank. She herself had only seen Plaintiff one time, two months earlier, in almost a year and a half.

Dr. Fournier checked off the "constantly" box which asked how often Plaintiff's pain or other symptoms were severe enough to interfere with attention and concentration needed to perform even simple work tasks. She checked the box indicating Plaintiff was incapable of even low stress jobs. She said she had side effects including drowsiness, dizziness, swelling, and nausea. She could walk less than one city block. She could sit only 10 minutes at a time and stand only 5 minutes at a time. She could sit and stand/walk a total of less than two hours in an 8-hour workday. She needed to include periods of walking around every 5 minutes for two minutes at a time. She must use a cane or other assistive device often. She would need to take unscheduled breaks. If she had prolonged sitting her legs must be elevated above the level of her heart 90% of the day. She could occasionally lift less than 10 pounds. She had significant limitations reaching, handling or fingering. She could never grasp, turn, twist, or do fine manipulation. She could reach only 5% of a day. She would average more than 4 absences per month. Finally, Dr. Fournier stated the "earliest date this description of symptoms and limitations on the questionnaire applie[d]" was 2007.

Persuasive contradictory evidence in the record supports the ALJ's rejection of Dr. Fournier's opinion on the form. Rheumatologist Joshi ordered numerous lab tests, all of which were normal. All x-rays were also normal, with the exception of "some degenerative changes of C5-6 and dextroscoliosis." Her mood was normal and her affect without depression or anxiety. Range of motion was normal in all joints except her right elbow, and she had only mild tenderness with no

swelling anywhere, except for moderate tenderness of the right elbow. Dr. Joshi, a specialist, only considered fibromyalgia as a "working diagnosis." He offered injections on three separate occasions for Plaintiff's painful joints, but Plaintiff rejected that advice every time.

In 2008, CFNP Kolanko noted pain on palpation of the neck, elbow, mid back, and lumbar spine, but normal straight leg raising, sensation, motor exam, and reflexes.

Dr. Shreiber noted Plaintiff could rise from seated and climb on and off the examination table without difficulty or assistance. There were no trigger points. She exhibited pain behaviors which disappeared with distraction. All ranges of motion were full. Her upper extremity strength was 5/5, grip was 5/5, and fine manipulation was normal.

Nurse Fahey, who also worked in the same clinic as CFNP Kolanko and Dr. Fournier, found Plaintiff's musculoskeletal system, motor exam, reflexes, and sensation were all normal.

In 2009, CFNP Kolanko found Plaintiff had no nausea, no abdominal pain, no diarrhea, no constipation, no arthralgias, no swelling, no stiffness, no dizziness, no fainting, no motor disturbance or sensory disturbance, no anxiety, depression or sleep disturbance. Every test was normal except for lumbar back pain on palpation. Motor exam was normal.

Rheumatologist Pollock found no joint swelling, no peripheral neuropathy, negative Tinel's sign, negative straight leg raising, normal range of motion of the shoulders, elbows, wrists, hands, knees, feet, and ankles, and good grip strength. He did note fine tremor of the hands.

In November, 2009, Plaintiff had "some" decrease in grip strength. Otherwise examination was normal except for discomfort on palpation of the upper neck, the back, and the hands and elbows.

Nurse Fahey found only slight swelling of the hands and feet.

In March 2010, only two months before Dr. Fournier's opinion that Plaintiff would need a cane or walker, Plaintiff told Nurse Kolanko that she was considering getting a cane or a walker.

Dr. Fournier's opinion is also inconsistent with those of the State Agency reviewing physicians. 20 CFR § 404.1527(f)(2)(I) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

Dr. Lim found Plaintiff could work at the light level. She had no manipulative limitations. He found her allegations not fully credible. Dr. Shaver found Plaintiff would have only moderate difficulties maintaining concentration, persistence or pace, and was only moderately limited in her ability to understand, remember, and carry out detailed instructions and maintain attention and concentration for extended periods. He opined she could operate in routine, low stress, work-like situations with only two to three step operations and minimal production quotas.

The undersigned finds all the above persuasive evidence is contradictory to Dr. Fournier's opinion that Plaintiff was totally disabled from all work.

Dr. Fournier's form opinion is also inconsistent with her own notes of office visits. In September 2008, Plaintiff was tolerating her medications "pretty well" and they were "helping with fibromyalgia pain." Although "sometimes" "a little dizzy" after taking meds, "it was tolerable." She was "overall feeling better." She was fully oriented and alert. Her mood was "anxious." Motor exam demonstrated no dysfunction. The assessment was "feelings of weakness," inflammatory

myopathy, and generalized anxiety disorder.

On November 17, 2008, Plaintiff told Dr. Fournier she had a lot more neck and low back pain and that her "hand hurt terribly if touches anything cold." She was fully oriented and alert. The only physical findings on exam were "tight tender muscles over the cervical paraspinous and mid back." There were no findings regarding her skin or hands. With no further findings or testing noted, Dr. Fournier diagnosed inflammatory myopathy (myositis), acroosteolysis,[6] and cervicalgia. Dr. Fournier stated: "Keep fu with rheumatologist in May, sounds like developed Raynaud's[7] do not let hands get cold." She advised Plaintiff to keep her follow-up appointment with her rheumatologist in May.

On December 4, 2008, Plaintiff saw Dr. Fournier for her chief complaint of knee and hip pain. She said she had trouble walking and could not bear weight. She was fully alert and oriented. She had a slow, antalgic gait with pain to palpation of the outer thighs, knees, and upper back. Psychiatrically her mood was listed as "one of pain." She was diagnosed with inflammatory myopathy (myositis) and bursitis.

On March 30, 2010, two months prior to the opinion at issue and almost 1 ½ years after her last visit with Dr. Fournier, Plaintiff presented to Dr. Fournier on the recommendation of CFNP Kolanko because he was concerned about her "polypharmacy" and was afraid he had reached his

---

[6]Dissolution of bone of the distal phalanges of the fingers and toes; applied especially to the removal or loss of the calcium of the bone. Dorland's Illustrated Medical Dictionary, ("Dorland's") pp. 20, 1346 (32nd ed. 2011).

[7]Intermittent bilateral ischemia of the fingers, toes, and sometimes ears and nose, with severe pallor and often paresthesias and pain, usually brought on by cold or emotional stimuli and relieved by heat; it is usually due to an underlying disease or anatomical abnormality. When it is idiopathic or primary it is called Raynaud's disease. Dorland's, supra at p. 1430.

prescribing limit. Plaintiff's chief complaint to Dr. Fournier this date was that she was starting to have tremors, was in a lot of pain, and was having a lot of trouble with her knees. She was fully alert and oriented and in no acute distress. She "appeared to have pain everywhere," with difficulty walking and standing. Her mood was "one of pain." The assessment was pain syndromes and fibromyalgia.

Notably, as the ALJ states, there is nothing in Dr. Fournier's own office notes regarding a need to elevate the legs above the heart 90% of the time. Dr. Fournier does not state a reason for this requirement. Plaintiff first mentioned her ankles swelling in an April 2010, phone call (one month before the questionnaire was filled out) to the clinic. She was advised over the phone to cut down on salt and elevate her legs. There is no other report or finding regarding this issue in Dr. Fournier's office notes. The day after the phone call, Plaintiff presented to Nurse Fahey complaining of swelling of the feet, ankles and hands. Upon examination Nurse Fahey noted "slight" hand, foot, and ankle swelling. She diagnosed soft tissue swelling and prescribed a low-dose diuretic, and continued her on a low salt diet, telling her to elevate her legs "as needed." She advised her that if the swelling worsened she was to go to the ER. Significantly, there is no record of her having done so. Further, from 2008 until March 2010, the reports all indicate "no soft tissue swelling." There is no evidence of CFNP Kolanko, who was the primary provider, or any other doctor ever noting soft tissue swelling. Substantial evidence supports the ALJ's determination that there is no support in the record, including in her own office notes, for Dr. Fournier's requirement that Plaintiff elevate her legs 90% of the time above her heart.

There is also nothing in Dr. Fournier's office notes to support her opinion that Plaintiff could not work at even a low stress job. First, as the ALJ notes, Dr. Fournier is a family doctor, and not

46

a psychologist or psychiatrist. Second, in the six times she saw Plaintiff, she described her every time as being fully alert and oriented. CFNP Kolanko, who saw Plaintiff 15 times in those same two years, also always found her fully alert and oriented. Although Dr. Fournier found Plaintiff's mood (in August 2008) depressed and anxious; (in September 2008) anxious; (in December 2008) "one of pain;" and (in March 2010) "one of pain," CFNP Kolanko, who saw her 15 times during those two years, and who is listed as her primary care provider, consistently found her mood euthymic.[8] Further, Plaintiff reported no anxiety, depression or sleep disturbance as late as June 2009.

Plaintiff's mood was first reported by her primary care provider as dysthymic[9] in September 2009, less than twelve months before the ALJ decision. This was two months after she began seeing a psychologist, whom she told she no longer loved her husband, and that she wanted a divorce, stating she "can't stand to be with him." The psychologist did not comment on Plaintiff's affect, but she expressly opined Plaintiff's thought process was logical. Her memory was good. She was fully oriented. Her insight was fair, and her estimated intellectual functioning was average. Although she was assessed with a current GAF of 49,[10] the psychologist found it had been 60[11] during the past

---

[8]Euthymia– a state of mental tranquility and well-being; neither depressed nor manic. Dorland's, supra.

[9]Dysthymic- Characterized by symptoms of mild depression. Id.

[10]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

[11]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

year.

Through the next year, the psychologist never found Plaintiff's concentration or ability to stay on task were impaired. She did find her to be depressed and anxious. First, she was "overwhelmed with financial concerns" and afraid "the two cars [as well as her house] are going to be repossessed." Her husband still had no job and his unemployment was ending. The next month she was overanxious because the car had indeed been repossessed and because her daughter and granddaughter were staying at her house. Consistently, when Plaintiff was upset and anxious, she described highly stressful situations occurring in her life. She was upset about financial stresses and inability to obtain medical care. She was upset because her son hated her. She was upset because her daughter had moved out and her son threatened to kill her and she had the locks on her house changed. She was then sad because her daughter and granddaughter moved out. She was concerned because her brother was sent to prison for DUI. She was upset because her husband was back at work so she now had to pay a co-pay for medical treatment. Yet throughout all these clearly stressful situations, the psychologist found Plaintiff was not suicidal or homicidal. She socialized with relatives over Thanksgiving. When her daughter, son-in-law, and grandchild were going to move back in, she stated she could handle the extra people in the house and potential stress this could cause.

Plaintiff was mailed her Notice of Hearing on April 20, 2010, scheduling her hearing for June 7, 2010 (R. 92). At her next psychology session, Plaintiff said she was worried about going to court in June. She was also upset because Dr. Pollock, the rheumatologist she saw 6 months earlier had said she was fat and she preferred to see another rheumatologist. She was also recently upset because her daughter had a respiratory issue and was rushed to the hospital.

48

There is nothing in the record that supports Dr. Fournier's opinion that Plaintiff was incapable of doing even low stress work. Her treating psychologist found her thought process was logical. Her memory was good. She was fully oriented. Her insight was fair, and her estimated intellectual functioning was average. Despite a number of very stressful events in Plaintiff's life, the treating psychologist never changed her opinion. Plaintiff herself told the psychologist that when her daughter, son-in-law and grandchild needed to move in with her, she could handle the extra people and potential stress. She was never suicidal or homicidal during that time.

Further, certain restrictions Dr. Fournier opined were necessary such as "significant limitations reaching, handling or fingering," and "never" grasping, turning, twisting or doing fine manipulation are not supported in the record beyond Plaintiff's one mention that her hands hurt if she held cold beverages, and Dr. Fournier's resulting opinion, "sounds like developed Raynaud's, do not let hands get cold." In September 2008, all her ranges of motion were full. Her upper extremity strength was 5/5, her hand grip was 5/5, and her fine manipulation was normal.

In September 2009, she had full range of motion, in her shoulders, elbows, wrists, and hands and her grip strength was good, although she was having a fine tremor over the hands at the time. In November 2009, and January 2010, she did have only "some" decrease in grip strength and pain in her hands on palpation.

Another of Plaintiff's arguments regards Dr. Fournier's opinion that Plaintiff "must"use a cane or other assistive device "often." Yet Dr. Fournier's office notes never mention a cane or walker, Plaintiff was never prescribed a cane or walker, and she told CFNP Kolanko only two months prior to the opinion that she was "considering" getting a cane or walker.

The undersigned finds Dr. Fournier's opinion is contradicted by other persuasive evidence,

and is inconsistent with her own treatment notes. The undersigned finds substantial evidence supports the ALJ's rejection this opinion, even if Dr. Fournier is deemed to be a treating physician

### D. Dr. Burton's Opinion of Disability

Plaintiff argues:

> The ALJ also selectively endorsed and cited a medical record which determined that Plaintiff was disabled. Rheumatologist Burton Pollock, M.D. examined Plaintiff on September 22, 2009. A diagnosis of somatoform disorder and fibromyalgia were reached. The ALJ readily recycled facts from Dr. Burton's [sic] report (T.R. 487-490) that show Plaintiff had few objective symptoms. However, the ALJ ignored, and in fact did not even mention, the following language from Dr. Burton [sic]:
>
> The woman is totally disabled by somatic form type disorder. She has symptoms relatively everywhere in the body. I tried to explain to her that there would be no quick fix and to try to avoid any surgery or more testing.
>
> The ALJ also ignored the fact that Dr. Pollock diagnosed plaintiff with depression, anxiety, IBS and migraines. While not as [sic] decision of disability by a state agency, it was the opinion of a treating physician, in whose opinion that ALJ apparently placed some considerable weight.

(Plaintiff's brief at 18). Plaintiff is plainly incorrect in representing that the ALJ ignored Dr. Pollocks' conclusions. (See R. 21). In fact, the ALJ found Plaintiff had a somatoform disorder, which was diagnosed only by non-mental health care provider Pollock.

> The claimant was examined by Burton Pollock,, MD, in September 2009. Dr. Pollock, a rheumatologist, reported that the claimant had complaints relevant to every organ system in her body. He noted that the claimant consulted with Dr. Young (another rheumatologist) due to generalized pain and fatigue. Although Dr. Young felt that the claimant had fibromyalgia, she opined that her symptoms were more deep seated in psychiatric problems. Noting that her X-Rays were all normal except for some mild degenerative joint disease, she had total body pain, fatigue, and symptoms relative to every organ system, numerous drug allergies and no joint swelling, Dr. Pollock opined that the claimant had somatoform disorder. Dr. Pollock recommended that the claimant have only one physician prescribing her medication and that her medication should be reduced, not increased. Dr. Pollock tried to explain to the claimant that she should try to avoid surgery or more testing. He scheduled the claimant for follow up in a couple of months. This is the last report

in the medical evidence of record from Dr. Pollock . . . . One could surmise that the claimant did not like what Dr. Pollock was saying.

Although one may believe the last sentence is overreaching, it is true that this is the last report from Dr. Pollock, a rheumatologist – and a specialist in fibromyalgia. Plaintiff was to follow up with him in a couple of months, but did not. In fact, she did not follow a single one of his recommendations. In March 2010, six months later, Plaintiff's primary care provider "urged" her to follow up with Dr. Pollock. In April 2010, Plaintiff told her psychologist that she "was upset because she had last seen [Dr. Pollock] about 6 months ago and he outright told her that she was fat."[12] She felt that he was rude and abrasive and she tried to explain her stomach problem to him which attributed to the weight gain. She said he also recommended that she start Savella for fibromyalgia, but she was anxious about that. As stated earlier, Savella is an antidepressant specifically FDA-approved for fibromyalgia. She spoke of another rheumatologist named Alayli, and said she would prefer to see him. Had she ever gone to see Dr. Alayli, which she did not, he would have been at least her fourth rheumatologist in three years, none of the previous three having found any objective signs of any significant impairment.

Also, the undersigned finds referring to Dr. Pollock as a treating physician is a bit misleading, considering he examined her, asked her to follow up with him, which she did not do, and advised her on treatment, advice which she did not follow.

Even if Dr. Pollock were considered a treating physician, his opinion that she was "disabled" by a somatoform disorder is not a "medical opinion" entitled to any special consideration whatsoever. First, and most importantly, the issue of whether a person is disabled is reserved to the

_____

[12]There is nothing in the record reflecting this dialogue.

51

Commissioner. See SSR 95-5p. Second, the "treating source's" "medical opinion" must be "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. Finally, the opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record. Dr. Pollock's opinion, though well-intentioned and possibly even correct, fails all three tests. His opinion is not supported by medically acceptable clinical and laboratory diagnostic techniques. To the contrary, it is based on the lack of any medically acceptable clinical and laboratory diagnostic techniques that would otherwise explain her symptoms. Significantly, Dr. Pollock is a rheumatologist. A somatoform disorder is "a mental disorder characterized by symptoms suggesting a general medical condition neither fully explained by a general medical condition, the direct effects of a psychoactive substance, or another mental disorder nor under voluntary control."[13]

Dr. Pollock, like Dr. Elizabeth Young before him, could find nothing physical to account for Plaintiff's allegedly disabling symptoms, so they diagnosed somatoform disorder. This diagnosis of a mental disorder is absolutely inconsistent with every single psychologist, psychiatrist, or mental health provider Plaintiff saw. She was not diagnosed with a somatoform disorder by any mental health provider. Even Dr. Fournier, who diagnosed other mental impairments, did not opine that her patient had a somatoform disorder.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's rejection of Dr. Pollock's opinion that Plaintiff was disabled.

## E.  Credibility

Plaintiff next argues the ALJ failed to properly analyze Plaintiff's subjective complaints of pain and Plaintiff's credibility regarding her exertional limitations. The Fourth Circuit has held that

---

[13]Dorland's, supra at p. 553.

"[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

Plaintiff first argues that the ALJ erred because he "made no threshold finding as to whether Plaintiff suffers from a medically determinable impairment which reasonably could be expected to

produce her subjective complaints of pain." (Plaintiff's brief at 12). Here, the ALJ found: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. . . . ." Although not the precise language used in <u>Craig</u>, the undersigned finds the ALJ did find Plaintiff met the first, threshold, step of the evaluation. He was therefore required to proceed to the second step and evaluate the intensity and persistence of her pain and the extent to which it affected her ability to work.

Plaintiff contends the ALJ erred in not considering the various factors set forth in 20 C.F.R. section 404.1529 in assessing her credibility. She argues he did not discuss, in any meaningful manner, the location, duration, frequency and intensity of Plaintiff's symptoms, the factors which precipitate the symptoms, and "other treatments or measures other than treatment she uses or has used to relieve pain of other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." The undersigned disagrees. Although the ALJ may not have discussed these factors in relation to his credibility finding, he did discuss them earlier in his decision (see, e.g., R. 19-22).

The ALJ further noted that Dr. Schreiber observed Plaintiff was able to arise from a seated position and climb on and off the examining table without difficulty or assistance; her gait was symmetrical; straight leg raising was negative; range of motion testing was either normal or only slightly decreased. Motor strength was 5/5. Grip strength was 5/5 and fine manipulation was normal. He found no trigger points. Significantly, as the ALJ noted, Dr. Schreiber observed that Plaintiff exhibited pain behaviors that disappeared with distraction.

SSR 96-7p provides, in pertinent part:

One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:

The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI.

The ALJ noted that Plaintiff told psychologist Golas that at times she used a cane or a walker, but then a year later, told her treating provider she was "considering getting a cane or walker." No doctor observed her using a cane or walker or other mobility aid. No doctor prescribed a cane or walker or mobility aid. Only 10 weeks after telling her primary provider she was "considering" getting a cane or walker, she testified at the hearing that if she was unable to get her legs moving she "had to get the walker." She had a walker and a cane with her at the hearing. She said she used the cane quite often and the walker about once a month.

The ALJ also noted that Plaintiff testified she quit work when she started getting sick. He then questioned her regarding the fact that the store at which she was employed closed around the same time. She admitted that fact.

State agency reviewing physician Dr. Lim, found Plaintiff's allegations were not fully credible.

The undersigned further notes that specialist Joshi offered Plaintiff injections he suggested

might alleviate her joint pain. Plaintiff declined the injections all three times he offered them.

Despite only having a "working diagnosis" of fibromyalgia after only three visits to Dr. Joshi within three months (the first documents in the record) Plaintiff presented to CFNP Kolanko, reporting a "large history of fibromyalgia."

Despite an echocardiogram in August 2008, which showed no evidence of mitral valve prolapse, Plaintiff subsequently told Dr. Shreiber and rheumatologist Pollock she had a history of mitral valve prolapse.

It is important to note that the ALJ did not reject Plaintiff's complaints of pain and limitation. He found she had the severe impairments of fibromyalgia; mild degenerative disc disease/degenerative arthritis of the cervical and thoracic spine; degenerative disc disease/degenerative arthritis of the lumbar spine with EMG and nerve conduction studies suggestive of radiculopathy; asthma; major depressive disorder, recurrent, severe; generalized anxiety disorder; somatoform disorder; and personality disorder with histrionic traits. Her resulting residual functional capacity was strikingly limited for a younger individual. The ALJ limited her to sedentary work plus an option to sit or stand; perform all posturals only occasionally, except no balancing or climbing ladders, ropes or scaffolds; to the maximum extent possible all walking should be done on level and even surfaces; no exposure to temperature extremes, wet or humid conditions, environmental pollutants or hazards, such as dangerous moving machinery or unprotected heights; work should be in a low stress environment with no production line or assembly line type of pace and no independent decision-making responsibilities; work should be unskilled with only routine and repetitive instructions and tasks; no interaction with the general public and no more than occasional interaction with coworkers and supervisors.

The ALJ's observations concerning credibility are to be given great weight. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984). The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's statements concerning her pain and limitations were not credible.

### F. Hypothetical to the VE

Plaintiff next argues the ALJ erred in not posing proper hypothetical questions which included all of the Plaintiff's limitations. Plaintiff refers in particular to her moderate decrease in concentration, persistence and pace and her need for use of a cane and a walker. Finally, Plaintiff argues the ALJ's hypothetical misstates the definition of sedentary employment, because, under 20 C.F.R. section 404.1567 and 416.967, a sedentary job is defined as one which involves sitting, but a certain amount of walking and standing is often necessary when carrying out job duties.

When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989)). If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. Edwards v. Bowen, 672 F. Supp. 230, 235 (E.D.N.C. 1987). In Koonce v. Apfel, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record.

The undersigned has already addressed Plaintiff's alleged need for a cane and a walker, including her claim to psychologist Golas that at times she used a cane or a walker, a year later

telling her treating provider she was "considering getting a cane or walker," and only 10 weeks after that, testifying that she used the cane quite often and the walker about once a month. The undersigned found substantial evidence supported the ALJ's determination that that limitation was not credible, and therefore finds it need not have been included in the hypothetical.

Plaintiff also argues that, despite finding that she had moderate difficulties with regard to concentration, persistence or pace, the ALJ did not include in his hypothetical to the VE any indication that she would be "off task" or "otherwise unable to focus on any employment which may be available." (Plaintiff's brief at 15). A review of the hearing transcript and the decision indicates the ALJ did address Plaintiff's moderate difficulties with regard to concentration, persistence or pace. He included in his hypothetical limitations including that Plaintiff would be limited to unskilled work, involving only routine and repetitive instructions and tasks, in a low stress environment, with no production line or assembly line type of pace, and with no independent decision-making responsibilities (R. 64). Based on those limitations, even in concert with numerous physical limitations, the VE testified that there would be a significant number of jobs available in the regional and national economy.

Finally, Plaintiff argues the ALJ's hypothetical "misstates the definition of sedentary employment," because, under 20 C.F.R. section 404.1567 and 416.967, "although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary when carrying out job duties." (Plaintiff's brief at 16). Plaintiff is correct in regard to the definition of "sedentary" under the C.F.R. The ALJ, however, specifically first asked the VE whether the two "less than sedentary jobs" identified by him would accommodate the use of a cane. The VE testified that they would accommodate the use of a cane to the degree that it was used to enter the

work site and get to the job position. The ALJ then specifically asked: "And then the job positions are pretty much in the same space most of the day?" To which the VE responded, "In both of these cases, yes." (R. 64). Social Security Ruling ("SSR") 96-9p provides:

> The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday . . . .

(Emphasis added). In other words, even jobs that require the ability to perform the full range of sedentary work may require only "very little" walking and standing. The Ruling continues:

> When there is a reduction in an individual's exertional or nonexertional capacity so that he or she is unable to perform substantially all of the occupations administrative noticed in Table No. 1, the individual will be unable to perform the full range of sedentary work: the occupational base will be "eroded" by the additional limitations or restrictions. However, the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability. There may be a number of occupations from the approximately 200 occupations administratively noticed, and jobs that exist in significant numbers, that an individual may still be able to perform even with a sedentary occupational base that has been eroded.

> Since each occupation administratively noticed by Table No. 1 represents numerous jobs, the ability to do even a limited range of sedentary work does not in itself establish disability in all individuals, although a finding of "disabled" usually applies when the full range of sedentary work is significantly eroded . . . . In deciding whether an individual who is limited to a partial range of sedentary work is able to make an adjustment to work other than any PRW ["past relevant work"] the adjudicator is required to make an individualized determination, considering age, education and work experience, including any skills the individuals may have that are transferable to other work, or education that provides for direct entry into skilled work, under the rules and guidelines in the regulations.

Finally:

> When the resolution of the unskilled sedentary occupational base is not clear, the

adjudicator may consult various authoritative written resources, such as the DOT, the SCO, the Occupational Outlook Handbook, or County Business Patterns.

In more complex cases, the adjudicator may use the resources of a vocational specialist or vocational expert. The vocational resource may be asked to provide any or all of the following: An analysis of the impact of the RFC upon the full range of sedentary work, which the adjudicator may consider in determining the extent of the erosion of the occupational base, examples of occupations the individual may be able to perform, and citations of the existence and number of jobs in such occupations in the national economy.

In this case, the ALJ did exactly as advised by the Ruling. He consulted a vocational expert regarding the impact of Plaintiff's ability to stand and walk. The VE gave examples of occupations Plaintiff could perform despite her limitations, and gave citations of the existence of the number of such occupations in the national economy.

In <u>Koonce v. Apfel,</u> 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence." Upon consideration of all of the above, the undersigned finds the ALJ did ask the VE hypothetical questions that included Plaintiff's limitations that were supported by substantial evidence. The VE then identified jobs in significant numbers in the regional and national economy that the hypothetical individual could perform. Substantial evidence therefore support the ALJ's reliance on the VE's testimony that jobs would exist that Plaintiff could perform.

### G. Consideration of State Eligibility for Medicaid Benefits

Plaintiff lastly argues that the ALJ erred by failing to even mention the fact that she had been found disabled and eligible for Medicaid benefits by the West Virginia DHHR. Defendant contends that the ALJ expressly considered "the entire record." Unfortunately, although the ALJ may have expressly stated that, and may, indeed, have considered the State disability decision, there

is no mention of it in his Decision. In <u>DeLoatche v. Heckler,</u> 715 F.2d 148, 150 n.1 (4th Cir. 1983), the Fourth Circuit stated:

> Neither the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary. Nevertheless, we have repeatedly stressed that "the opinion of a claimant's treating physician is entitled to great weight." Similarly, <u>the disability determination of a state agency is entitled to consideration by the Secretary</u>.

(Emphasis added). The undersigned understands the defendant's frustration. Plaintiff filed her application for DIB on July 25, 2008. Yet there is no mention in the record of her having been awarded State Medicaid in the record until May 20, 2009, when counsel submitted one State DHHR Notice indicating that Plaintiff's application for Medicaid was approved solely for the month of March 2009 (R. 241). Nearly a full year later, and only weeks before the Administrative hearing, Plaintiff submitted more Notices indicating her application for Medicaid had been approved for the months of October 2008 through May 2009 (R. 250). As Defendant argues, these Notices do not provide any basis on which the award was made. There is no medical evidence or even the name of a health care provider on whose opinion the DHHR may have relied. The notices do not even mention the impairment(s), if any, Plaintiff had, or if they may have been temporary or considered permanent. The "Detailed Notices" provide only as follows:

ACTION:     Your application for SSI Related Medicaid for the Aged, Blind and Disabled dated 12/11/08 has been APPROVED. You are approved to get this benefit from 10/16 08 through 10/31/08.[14]

REASON:     Your assistance group met all eligibility requirements.

---

[14]The Notices were identical except for each being for a different one of the 8 months Plaintiff was found eligible for benefits.

A review of the Administrative Hearing transcript shows neither counsel nor Plaintiff mentioned the award of Medicaid benefits that lasted only eight months and ended more than a year earlier. As counsel argues, he did include the information in his Pre-Hearing brief submitted at the hearing.

As already stated, the determination of another governmental entity is not binding on the Secretary. It is not entitled to any significant weight. It is, however, entitled to consideration. A review of the ALJ's decision does not reflect that he considered, or even mentioned, the State DHHR award of 8 months of Medicaid benefits to Plaintiff. Although the undersigned cannot find that a consideration of the award would reasonably have changed the ALJ's decision, the failure to do so is error that the undersigned cannot find to be harmless under DeLoatche.

## V. CONCLUSION

Upon consideration of all of the above, the undersigned United States Magistrate Judge finds and concludes that substantial evidence does not support the ALJ's determination that Plaintiff was not disabled during the relevant time period, and recommends the case be reversed and remanded solely for the Commissioner to take into consideration Plaintiff's award of Medicaid by the West Virginia DHHR for the months of October 2008 through May 2009.

## VI. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is not supported by substantial evidence. I therefore **RECOMMEND** Defendant's Motion for Summary Judgment be **DENIED**, and Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** by reversing the Secretary's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further

proceedings consistent and in accord with this Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _13_ day of May, 2013.


_____
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE